```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
                       AIKEN DIVISION

United States of America,      )
                               )
            Plaintiff,         )
                               )
         -vs.-                 )    January 10, 2020
                               )    Columbia, SC
Charles Mercier a/k/a "Chuck"  )    1:18-cr-00617-1
Mark Buckland                  )    1:18-cr-00617-2
Virginia Buckland              )    1:18-cr-00617-3
                               )
            Defendants.        )
_____)


          BEFORE THE HONORABLE J. MICHELLE CHILDS
          UNITED STATES DISTRICT JUDGE, PRESIDING
                    TELEPHONE CONFERENCE

A P P E A R A N C E S:

For the Government:       JAMES MAY, AUSA
                          U.S. Attorney's Office
                          1441 Main Street, Suite 500
                          Columbia, SC 29201

For Charles Mercier:      KATHERINE E. EVATT, AFPD
                          Federal Public Defender's Office
                          1901 Assembly Street
                          Columbia, SC 29201

For Mark Buckland:        DEBORAH B. BARBIER, ATTORNEY AT LAW
                          Barbier Law Office
                          1811 Pickens Street
                          Columbia, SC 29201

For Virginia Buckland:    ROSE MARY PARHAM, ATTORNEY AT LAW
                          Parham Law Office
                          P.O. Box 1514
                          Florence, SC 29503

Court Reporter:           Jennifer H. Williams, RPR
                          United States Court Reporter
                          901 Richland Street
                          Columbia, SC 29201
              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                       *** *** *** ***
```

>           THE CLERK:  Thank you very much.  And just to
> advise you all, we are now in session.  Judge Childs is on
> the bench, and this is on the record.
>           THE COURT:  Good morning, everyone.  This is
> criminal matter number 1:18-cr-617.  It's USA vs. Charles
> Mercier.  Who is on the line for the government?
>           MR. MAY:  Jim May.
>           THE COURT:  And then for Charles Mercier?
>           MS. EVATT:  Kathy Evatt.
>           THE COURT:  Okay.  And then do we have Probation on
> the line?
>           PROBATION OFFICER HORTON:  Yes, ma'am.
>           PROBATION OFFICER CARROLL:  Yes, Your Honor.
>           THE COURT:  Okay.  Who is on the line for
> Probation?
>           PROBATION OFFICER CARROLL:  Ron Carroll and Tara
> Horton.
>           THE COURT:  Thank you very much.
>           MR. MAY:  Your Honor.  Your Honor.  We also have --
> there are additional defendants that are involved in this
> case.
>           THE COURT:  Okay.
>           MR. MAY:  Their last name is Buckland.  They are
> husband and wife.  And they are represented by Debbie Barbier
> and Rose Mary Parham who are both on the line as well.

THE COURT: Okay. Thank you very much.

All right. Mr. May, you want to start?

MR. MAY: Yes, ma'am. Ms. Barbier and Ms. Parham reached out to the government and asked us to see if the Court would be amenable to us coming by and discussing a matter in chambers regarding the resolution of this case. I believe we have reached a resolution in principle. And that was the understanding at least of the government and I believe of Ms. Parham and Ms. Rose Mary of this call.

But I believe that we have reached an agreement of principle, which the defendants would be pleading guilty. The stipulation would be that -- as a background of this case, this is a case that originates in North Augusta with Mr. Mercier. Mr. Mercier was a life insurance agent.

What the government can show is that he traveled to Fort Worth, Texas, and obtained life insurance policies on an Anita Fox. Ms. Fox is now dead. Ms. Fox we believe, it appears, was involved in the obtaining of these policies. They appear to be fraudulent.

At some point the policies were transferred and sold with Mr. Mercier being a conduit to that by Mr. Buckland who is Ms. Fox's son-in-law. One policy was sold to some brothers named Gorman who live across the country who are Travelers. Mr. Buckland -- or the Bucklands and Ms. Fox were English Travelers.

The policy was sold. It was a one-million-dollar policy. It was sold to four brothers. At some point one of the brothers took it upon his hands to bring about the death of Ms. Buckland -- I mean of Ms. Fox. He murdered her. He subsequently has died, and his son has pled guilty to the murder.

We have no evidence -- and I believe that Mr. Buckland has a Texas Ranger polygraph as far as his involvement in the murder. However, Mr. Buckland, Ms. Buckland, and Mr. Mercier were involved in the illegal transfer of that policy. Again, it was a one-million-dollar policy that was fraudulently transferred from the ownership of Mr. Buckland to Mr. Gorman or the Gormans collectively.

We have reached an agreement in principle which would be the government stipulating that a non-custodial five-year probationary sentence is appropriate, as this -- what we can prove is a single -- it would be the statute of limitations -- is a single transfer of one policy.

And as a result of these negotiations, Ms. Barbier and Ms. Parham asked if we could, again, present this to the Court as what we believe is an appropriate resolution; and then, hopefully, if the Court is in agreement, that we could schedule a hearing, a Rule 11 hearing, and resolve this matter.

THE COURT: Okay. I can't tell you yes right here

today without seeing a pre-sentence report and knowing a little bit about the discovery in the case and whether or not there has been any issue of evidence that there is more than just the collusion of a transfer of a policy. But, you know, we've got a murder here. So I would need to know, you know, what's the status on that.

Probation have anything to state at this time about where you are with respect to the report?

PROBATION OFFICER HORTON: No, ma'am. We don't start the report until after the plea.

THE COURT: Okay.

PROBATION OFFICER HORTON: And I don't believe we have any information in the case.

THE COURT: I'm sorry. I didn't hear you. You don't start work on it until after the --

PROBATION OFFICER HORTON: We have no information on the case.

THE COURT: Oh. You have no information on the case. Okay. I mean, obviously, Mr. May, you're an officer of the court, but I can't just tell you that with those kind of facts that I would just say non-custodial sentence right here today with nothing in front of me.

MR. MAY: Yes, ma'am. And again, we would anticipate the Court would review it. Again --

THE COURT: But review what? But review what? All

I would have is an indictment.

        MR. MAY:  No, ma'am.

        THE COURT:  And the plea agreement.

        MR. MAY:  Well, that you would -- of course the stipulation, it's not binding upon the Court.  But of course you'd review a pre-sentence report when one is prepared.

        THE COURT:  Oh, okay.

        MR. MAY:  Again, this is -- the murder is, you know, has -- I have no evidence -- and, in fact, he has passed a polygraph -- that any of these defendants were involved in the murder.  It is just a consequence of, you know, selling -- they sold a life insurance policy to the wrong people.

        THE COURT:  You say you have no evidence these current defendants were involved?

        MR. MAY:  Correct.

        THE COURT:  Okay.  But you mentioned earlier that there was a brother involved and then somebody pled guilty?

        MR. MAY:  Yes, ma'am.  So, yes, ma'am.  Okay.  Again, a life insurance policy was transferred from the Bucklands.  All right.  The Bucklands had a standard life insurance policy on Ms. Buckland, Virginia Buckland's mother, Anita Buckland.  They had -- they had obtained five million dollars of life insurance policies that is outside the statute of limitations.  They transferred one of those

policies.  It was a million-dollar policy.  They transferred it to a group of brothers who are our Travelers named the Gormans.  That is the illegal -- that is the wire -- that's the wire fraud that we have in this case.

You have the wire fraud that goes to the Bucklands -- I mean; I'm sorry -- to the Gormans.  The Gormans, approximately 11 months later, one of the Gormans takes it upon himself to pay someone for the death of Ms. Fox.  He and his son kill Ms. Fox.  There is zero evidence that the Bucklands were involved.  There is zero evidence Mr. Mercier was involved, absent the nexus of the Bucklands and the Gormans to transfer this policy.

    THE COURT:  Okay.

    MR. MAY:  Mr. Buckland sat for and passed a Texas Rangers polygraph on this issue.

    THE COURT:  Who passed the polygraph?

    MR. MAY:  Mark Buckland who is a defendant.

    THE COURT:  Okay.

    MR. MAY:  He is the one who transferred the policy.  We have -- again, we have no evidence that he was involved in the murder whatsoever.  So Mr. Gorman, one of the Gormans who killed Ms. Fox, died while on the run from the police.  He had a heart attack.  His son was an accomplice.  His son has pled guilty and has been sentenced to 12 years in the Texas State Department of Corrections.

Again, that is -- when they sold -- when Mr. Buckland sold the policy to the Gormans, there is no evidence whatsoever that there was any kind of direction.  And, in fact, it appears that Mr. Buckland -- I mean Mr. Buckland -- knew nothing about the person who eventually did the killing.  I don't believe he ever met them.

These are -- the Gormans are Irish Travelers.  The Bucklands are English Travelers.  And the conduit, what allowed this transfer to go through was Mr. Mercier.  And the illegal representations is that there was an insurable interest in Ms. Fox, that the Gormans had an insurable interest in Ms. Fox, which was untrue.

THE COURT:  Okay.  In the indictment -- which I don't have that right in front of me -- is there any allegation of a conspiracy to murder with respect to these defendants?

MR. MAY:  No.  Murder is mentioned because that is what happened as a -- and so the government's position is it would not be foreseeable that when you transfer a life insurance policy without an insurable interest -- so, therefore, you commit wire fraud in the transfer of a life insurance policy; it is not reasonably foreseeable that the person you transfer it to is going to kill the insured.

Your Honor and Tara both know we've had a bunch of these transfers where there is no insurable interest, and we have

not seen a murder yet but for this case.

          THE COURT:  Okay.  All right.  Anything from defense counsel?  And just please state who is speaking.

          MS. BARBIER:  Hi, Your Honor.  This is Debbie Barbier on behalf of Mark Buckland.  I appreciate your time this morning.  We just wanted to, you know, have these issues aired in front of the Court before any plea took place.  I understand that you don't have discovery and you don't have a PSR and you don't have, you know, other information to review at this point.

    But, you know, we would like to resolve it and agree with the tentative resolution that we've reached but want to assure our clients -- or at least have a high level of confidence -- that this is something that the Court would -- a resolution the Court would agree with.  And so, you know, that was the purpose of the call today.

          THE COURT:  Okay.  Probation, anything to add?  I mean, you say you have no information about the case.  Just having I guess reviewed the indictment or done anything cursory, is there anything of concern?

          PROBATION OFFICER CARROLL:  Your Honor, the only thing that I would point out, and I'll certainly let Mr. May and the defense attorneys --

          THE COURT:  We can't hear you.  We can't hear you.

          PROBATION OFFICER CARROLL:  Sorry about that, Your

Honor.  I was explaining that I'll let Mr. May and the defense attorneys speak with you about this.

So in reviewing the indictment, you had a question about the murder.  In Subsection (e) of paragraph 5, it states: "It was further a part of the scheme and artifice to defraud the insurance company to cause the death of the insured by stabbing and bludgeoning, to make the defendants immediately eligible to collect the benefits of the policy."

   COURT REPORTER:  I cannot hear him clearly.  I'm sorry.

   THE COURT:  Hold on.  We can't hear you.  Are you -- yeah.  I don't know if you're at a speaker phone or what, but we can't hear you.

   PROBATION OFFICER CARROLL:  Yes.  I picked up the speaker phone.  But basically I was pointing to the indictment or the charging document in this case.

At paragraph 5, Subsection (e), it states:  "It was further part of the scheme and artifice to defraud the insurance company to cause the death of the insured by stabbing and bludgeoning, to make the defendants immediately eligible to collect the benefits of the policy."

So again, I've heard Mr. May talk and say that there is zero evidence to show that these individuals were involved. And while we absolutely have no information on the case but that part of the indictment, when you asked the question of

whether the death was mentioned or involved in the charging document is what I was just pointing out. And I certainly would defer to the prosecutor and the defense attorneys to --

THE COURT: And how do you suggest that that --

PROBATION OFFICER CARROLL: I don't --

THE COURT: How do you suggest that affects your guideline calculation then? Because we've got Mr. May stating that it would be wire fraud. But I've got the indictment now printed and in front of me and I'm looking at Subsection 5(d) and (e). And it does have an issue about "to cause the death," as you indicated.

PROBATION OFFICER CARROLL: I don't believe it will affect the mechanics of the guidelines based on the offense of conviction, the 1349 that's being alleged. There's nothing within 2B.1.1 that addresses specifically death or the offense of causing a death or anything related to that. It's just what type of the information that might, you know, bring into play. And, again --

THE COURT: Yeah. Because I -- and I understand what you're going with, that this is an indictment that comes out of a grand jury. So if those words are used, the grand jury saw something.

MR. MAY: Your Honor, this is Jim.

THE COURT: Okay.

MR. MAY: And again, when we're looking at the

entire conspiracy, the entire conspiracy involves the Gormans. The Gormans are not named in the indictment; however, they were unnamed co-conspirators who did in furtherance of the conspiracy kill Ms. Fox.

Again, what I think that -- and if I'm wrong, please, Robbie, correct me -- the issue is is what is reasonably foreseeable within the conspiracy for each individual defendant.

We have no evidence that the named defendants -- while there are other people in the conspiracy; specifically, the Gormans, who took these actions in furtherance of the conspiracy, the named defendants: Mark Buckland, Virginia Buckland, and Charles Mercier, it was not legally foreseeable to them that this killing would occur. And I will make that abundantly clear on the record.

        THE COURT: Okay. Well, as I indicated --

        MS. PARHAM: Hello.

        THE COURT: Go ahead. Go ahead. Who is speaking?

        MS. PARHAM: I'm sorry. It's Rose Mary Parham. Good morning, Your Honor. I've had a couple of strange cases like this in Florence. And in those cases, the Court allowed, just because of the unusual fact pattern, that the pre-sentence report could be prepared in advance of the guilty plea. I didn't know if that would be something the Court would consider in this case since it is an unusual case

and since Probation does not have the discovery.

        THE COURT:  That's fair to me.  Probation, do you see any issue with that?

        PROBATION OFFICER CARROLL:  To prepare the report prior to plea?  Is that the question, Rose Mary?

        THE COURT:  Yeah.  Before the plea.  I'm not going to put you on an expedited timeframe, but just before the plea.

        PROBATION OFFICER CARROLL:  We certainly can prepare the pre-sentence report.  The consent forms, if you sign the consent forms and you get them to us and then get us the information concerning the offense of conviction so that we can prepare the offense conduct, certainly we can address that and take care of that.

        THE COURT:  Okay.  Well, let's do that.

        MS. PARHAM:  That would be wonderful.  And then the Court would have a -- go ahead.

        THE COURT:  No.  I'm saying let's do that, because I can't make the decision in a vacuum without knowing what is coming before me.  And I understand Mr. May's representation, but I've got to not discount Probation's role in all of this as well, because I don't know what they're going to present to me; or all us of, for that matter.

        MR. MAY:  We have no objection.  And I could get -- and, Tara, I could get you everything probably by Tuesday if

that's okay.

THE COURT: Okay. So let's --

MS. EVATT: And I'll be happy -- this is Kathy. I'll be happy to prepare the consent forms for everyone and send them to all the lawyers for their clients' signatures. I have those on my computer.

MR. MAY: Kathy, could you --

PROBATION OFFICER CARROLL: Thank you. I was about to suggest that.

MR. MAY: Could you add some tolling language in there, Kathy?

MS. EVATT: Yeah. I'll send that to Debbie and Rose Mary, too.

MR. MAY: Yeah. If you could add the tolling --

MS. PARHAM: Thank you, Kathy.

MR. MAY: -- of the speedy trial, that would be great.

THE COURT: Okay.

MS. EVATT: Yes.

THE COURT: I think we have resolved that part, that we'll get the report first and then we can reconvene once the report comes out.

MR. MAY: All right. Thank you.

MS. EVATT: Thank you, Judge.

THE COURT: Okay. Thank you all.

MS. PARHAM: Thank you, Your Honor.

THE COURT: And thank you for that suggestion. Okay. You all have a great weekend.

MS. BARBIER: Okay. Thank you.

MR. MAY: Bye.

MS. EVATT: Thank you. Bye-bye.

(WHEREUPON, the proceedings are concluded.)

\*\*\*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


s/Jennifer H. Williams

_____               January 31, 2020

Jennifer H. Williams, RPR